IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LALONNIE MARIE GROVES, | ) | Case No. 07-60283 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| LALONNIE MARIE, | ) | Adversary No. 07-6032 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITIBANK NA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

<u>AMENDED MEMORANDUM OPINION</u>

Debtor Lalonnie Marie a/k/a Lalonnie Marie Groves seeks to discharge

$216,849.12 in student loans held by Education Credit Management Corporation

("ECMC") and Sallie Mae, Inc. ("Sallie Mae") pursuant to 11 U.S.C. § 523(a)(8)

because repaying them would impose an undue hardship for her.[1]  This is a core

_____

[1]  In addition to Sallie Mae (a/k/a SM Servicing) and ECMC, the Debtor named as
defendants Citibank NA, Educaidextra Prem Ln [sic], LMV Funding, MOHELA, and
Campus Partners.  Defendant USAF was thereafter substituted for MOHELA, and was
then dismissed from the case.  (Doc. #75).  American Education Services, as Servicing
Agent for Wachovia Educational Finance, provider of the Educaidextra Premium Loan,
(collectively, "AES")  filed an Answer, stating that it had made a claim against its
guarantor and, once the guarantor honored the guaranty, AES would no longer have an
interest in this adversary proceeding.  AES was then dismissed from the case, with its
claim being assigned to Sallie Mae.  (Doc. #130).  None of the other named defendants
filed answers or otherwise participated in this case.  Accordingly, to the extent that the
Debtor may owe student loans to Citibank NA, LMV Funding, or Campus Partners,

proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction

pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1).  The following constitutes

my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the

Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052

of the Federal Rules of Bankruptcy Procedure.  The Debtor contends that, due to a

depressive disorder, requiring her to repay her student loans would impose an undue

hardship on her.  For the reasons that follow, I find that, the Debtor is capable of

working and repaying some of her student loans, but that requiring her to repay all of

the outstanding loans would impose an undue hardship on her.  In deciding which of

her student loans should be discharged, I find that the Sallie Mae loans pose the

greater hardship because Sallie Mae does not offer an income contingent repayment

plan.  In addition, because I find that the Debtor is capable of earning income

sufficient to make a monthly payment of approximately $300 without an undue

hardship, a number of the ECMC loans will be discharged, and others will not be

discharged.

## FACTUAL BACKGROUND

The Debtor is 33 years old, is single, and has no dependents.  She has lived with

her parents since July 2005.  She graduated in 1999 from Evangel University in

---

default judgment will be entered against those defendants.

Springfield, Missouri, with a Bachelor of Science degree in Communication Studies,
with a concentration in Public Relations/Advertising, and a minor in Art.  In 2002, she
graduated from Assemblies of God Theological Seminary in Springfield, Missouri,
with a Master of Arts degree in Counseling.  Between 2002 and 2006, the Debtor was
enrolled at Forest Institute of Professional Psychology seeking a doctoral degree
(Psy.D.) in Clinical Psychology.  However, the Debtor never received her doctoral
degree because she received more than the maximum allowed course grades of "C"
and because she did not complete the requirement of an accredited doctoral
internship.[2]  Currently, the Debtor has terminated all efforts to complete the
requirements for her degree.  In her testimony at trial, she stated that the only
requirements that remain for the doctorate are the successful completion of a course
entitled, "Advanced Rorschach," and a doctoral internship.

During the course of her education, the Debtor took out several student loans.
Sallie Mae is the holder of three such loans obtained in 2002 and 2003, and the
assignee of a loan obtained in 1998,[3] which have a combined outstanding balance of

---

[2] According to the Debtor, at the Forest Institute, the Psy. D. program requires
successful completion of a defined number of credit hours, practicum, doctoral
dissertation and defense, an accredited internship, comprehensive exams, a minimum
GPA of 3.0 and no more than three course grades of "C."

[3]  The original holder of the 1998 note was American Education Service (AES),
who was dismissed as a defendant from this case after it assigned this loan.  *See* Footnote
1, *supra*.

3

approximately $32,063.73 as of the date of the hearing. ECMC is the holder of 27

such loans totaling approximately $184,785.39, as of the date of the hearing. Prior to

bankruptcy, the Debtor had repaid other student loans which were held by Wells

Fargo Bank, apparently with the help of her parents.

The Debtor filed a Chapter 7 bankruptcy petition on March 9, 2007, and has

obtained a discharge of her debts, other than these student loans. She commenced this

adversary proceeding seeking to discharge the student loans.[4]

### DISCUSSION

Under § 523(a)(8) of the Bankruptcy Code, student loans are nondischargeable

unless repayment of the loan would impose an undue hardship on the debtor or her

dependents.[5]  The burden of establishing undue hardship, by a preponderance of the

evidence, is on the debtor.[6]  The Code contains no definition of the phrase "undue

hardship" and interpretation of the concept has been left to the courts. In this Circuit,

the applicable standard is the "totality of the circumstances" test as set forth in

---

[4]  The Court is grateful to Thomas O'Neal, John Tiner and Shughart Thomson & Kilroy, P.C., for agreeing to represent the Debtor pro bono in this adversary action.

[5]  11 U.S.C. § 523(a)(8).

[6]  *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews),* 661 F.2d 702, 704 (8th Cir. 1981); *Ford v. Student Loan Guarantee Found. of Arkansas (In re Ford),* 269 B.R. 673, 675 (B.A.P. 8th Cir. 2001).

4

*Andrews*.[7]  In applying this approach, the courts are to consider: (1) the debtor's past,

current and reasonably reliable future financial resources; (2) the reasonable necessary

living expenses of the debtor and the debtor's dependents; and (3) and any other

relevant facts and circumstances unique to the particular case.[8]

The principal inquiry is to determine whether "the debtor's reasonable future

financial resources will sufficiently cover payment of the student loan debt - while still

allowing for a minimal standard of living"; if so, the indebtedness should not be

discharged.[9]  Bankruptcy courts are required to analyze a debtor's student loans, and

make a determination of nondischargeability of them, on a loan-by-loan basis.[10]  There

is no authority in this Circuit for discharging only a portion of a particular loan.[11]

---

[7] *Long v. Educ. Credit Mgmt. Corp. (In re Long),* 322 F.3d 549, 554 (8th Cir. 2003); *In re Andrews,* 661 F.2d at 704.

[8] *Long,* 322 F.3d at 544, *Ford* 269 B.R. at 676.

[9] *Long,* 322 F.3d at 554.

[10] *See Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 136-37 (B.A.P. 8th Cir. 1999) (questioning whether courts can grant a partial discharge of a single student loan, but expressly endorsing the application of § 523(a)(8) on a loan-by-loan basis) (abrogated on other grounds in *In re Long*, 322 F.3d 549 (8th Cir. 2003)); *see also In re Poe*, 354 B.R. 265, 271 (Bankr. W.D. Mo. 2006) (stating that undue hardship may be determined on a loan-by-loan basis, but declining to do so because the debtor had offered no evidence as to what the payment amounts would be under the various loans at issue).

[11] *Cf., e.g., Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200 (10th Cir. 2005) (holding that a bankruptcy court can grant a partial discharge of student loans when § 523(a)(8) has been satisfied); *In re Miller*, 377 F.3d 616 (6th Cir. 2004)

### A.   The Debtor's Past, Current and Reasonably Reliable Future Financial Resources

#### 1.   The Debtor's Education and Qualifications

The Debtor is currently a licensed professional counselor.[12]  She has held five counseling-related jobs from 1999 to 2007,[13] and has also held a couple of sales positions at retail stores for short amounts of time during this period.  However, despite this employment, the highest income that the Debtor earned in any of these years was $8,568 in 2004,[14] and she reported no income in her last two years tax returns.

The Debtor has been unemployed since February 2007.  She testified that she has no current income but that she did earn some money, approximately $10 - 20 per

---

(same); *Saxman v. Educational Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168 (9th Cir. 2003); *with Educ. Credit Mgmt. Corp. v. Carter*, 279 B.R. 872 (M..D. Ga. 2002) (holding that § 523(a)(8) does not allow the bankruptcy court to grant a partial discharge); *Skaggs v. Great Lakes Higher Educ. Corp.*, 196 B.R. 865 (Bankr. W.D. Okla. 1996) (same).

[12]  In the past, the Debtor was also, *inter alia*, a Nationally-Certified Counselor (2004-07) and a Registered Substance Abuse Professional, Missouri (2005-07).

[13]  She was a Psychology-Technician at Lakeland Regional Hospital in Springfield, Missouri; a Counselor at the Family Life Institute in Springfield, Missouri; a Targeted Case Manager in the Children's Services Department of Burrell Behavioral Health in Springfield, Missouri; a Licensed Therapist at the Robert J. Murney Clinic in Springfield, Missouri; and a sole proprietor of Groves Behavioral Health.

[14]  According to the Debtor, much of this employment was related to her education in the way of internships and doctoral or masters practicum requirements and therefore, did not produce income for her.

6

month, by selling personal items on Ebay and selling her plasma.  However, she says

she is no longer able to do either of those things.  In addition, at one point, the Debtor

stated that she intended to sue the Forest Institute of Professional Psychology for

fraud, essentially based on its alleged failure to assist her in completing her doctorate,

but she states that she is no longer actively pursuing that claim, nor does she anticipate

receiving any considerable judgment or settlement from it.

### 2.  The Debtor's Mental Condition

At trial, I found the Debtor to be intelligent, personable, and articulate.  Based

on her testimony and the other evidence offered, she should be able to find and

maintain employment. The Debtor asserts, however, that she is unable to obtain

employment because she suffers from depression which affects her ability to work and

because no one will hire her in any event.  She also says that the existence of what she

views as insurmountable student loan debt contributes to her depression.

The Eighth Circuit has held, in *In re Reynolds*,[15] that a debtor's mental

condition can be a factor in deciding that a student loan should be discharged, not only

if the mental condition prevents the debtor from gaining meaningful employment, but

also if the existence of the student loan itself contributes to the mental condition.  In

---

[15] *Reynolds v. Pennsylvania Higher Educ. Asst. Agency (In re Reynolds)*, 425
F.3d 526 (8th Cir. 2005).

7

*Reynolds*, the debtor, who had suffered from depressive symptoms since she was a child, was treated by a psychiatrist for agoraphobia and depression and took numerous medications, such as antidepressants, mood-stabilizers and anti-psychotic medications. The bankruptcy court found that, because the continuing liability from debts posed a threat to the debtor's fragile mental health, requiring her to pay them would impose an undue hardship on her.  The Eighth Circuit affirmed.[16]

The Debtor asserts that she is suffering from either a depressive disorder not otherwise specified or a late onset dysthymic disorder and a major depressive disorder.[17]   On that issue, the Debtor offered her own self evaluations and the evaluation of Dr. Craig Shifrin, a clinical/forensic psychologist who examined the Debtor.

Dr. Shifrin, who has been a licensed psychologist for approximately 17 years, testified that he had to deviate somewhat from his standard evaluation procedures because of the Debtor's extensive knowledge of psychology, which would enable her to manipulate the results.  Dr. Shifrin diagnosed the Debtor with Depressive Disorder

---

[16] *Id*. at 533.

[17]  "Dysthymia" is defined as "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." Lippincott, Williams & Wilkins, *Steadmans Medical Dictionary* (27th ed.).

8

Not Otherwise Specified based on four interviews he conducted in June and July of 2008. He determined that her condition is primarily situational and that she does not have a long-term and consistently severe emotional disorder such as chronic and/or biological depression, as evidenced by, *inter alia*, her not needing medication. As a clinical psychologist, although Dr. Shifrin is not licensed to write prescriptions, he is trained in and has the authority to recommend medication for patients. He testified that he did not recommend that the Debtor take any medication for her depression.

Dr. Shifrin further testified that it was difficult to say whether the outstanding loans prevented the Debtor from being able to work, stating that the Debtor is not impacted by depression to the point of immobilization. Although the Debtor declared that she suffers from general feelings of depression, occasional alcohol abuse, feelings of isolation from others, difficulty coping with daily activities, mood swings, insomnia and a decreased interest in taking care of herself, Dr. Shifrin did not conclude that the Debtor suffers from any major, permanent psychological disorder. In his testimony, Dr. Shifrin indicated that several factors, including the Debtor's failed marriage, her inability to obtain her doctoral degree, the failure of her business and her outstanding student loans, have all affected the Debtor's mental condition. However, he testified that the Debtor's mental condition has improved over the last three years. And, he testified that he could not state for certain that discharge of liability on the loans

9

would lead to additional improvement in her mental condition.

Both Dr. Shifrin and the Debtor used the Global Assessment of Functioning ("GAF")[18] scale in their psychological evaluations, although they arrived at significantly different scores. The Eighth Circuit has utilized the GAF scale as an acceptable means of evaluating a person's social, occupational, and psychological functioning.[19] According to the Diagnostic and Statistical Manual of Mental Disorders:

> On a 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61-70 represents some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning reasonably well and having some meaningful interpersonal relationships.[20]

Dr. Shifrin assigned a score of 64 to the Debtor and testified that this indicates that she suffers some difficultly in functioning normally.[21] The Debtor gave herself

---

[18] *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 34 (4th Ed., 2000).

[19] *See, e.g., Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661 (8th Cir. 2003) (relying, in part, to the GAF scale in a social security case).

[20] *DSM-IV*, at 32.

[21] Dr. Shifrin testified that he considered himself qualified to assign a GAF score to a patient without using the generally accepted test. In his evaluation of the Debtor, Dr. Shifrin stated that the normal test given to patients would not work on the Debtor because

a score of 45 and asserts that she has significant and ongoing psycho-physiological issues that impair her ability to both obtain and maintain any type of gainful employment.

As the Defendants argue, the Debtor's conclusions as to her own mental condition are suspect because they are self-serving. Dr. Shifrin concurred, stating that the Debtor's self-diagnosis, made while acting as a psychological counselor, is not appropriate and would not be relied upon in the field of psychology. I agree, and find Dr. Shifrin's diagnosis to be more credible.

I find that the Debtor's situation in the present case does not rise to the level indicated by the facts of *Reynolds*, as the Debtor is not currently being (nor has she been in her past) treated for depression and takes no medication. The foregoing discussion of the Debtor's mental condition simply illustrates an unfortunate set of circumstances inflicted upon a capable and adept person. It is evident from the Debtor's ability to conquer her past difficulties, including an abusive relationship and her past alcohol abuse, that she possesses the confidence and self-worth to overcome her current situation and acquire and maintain gainful employment. Indeed, Dr. Shifrin testified that she is able to communicate well, a factor that would contribute

---

her knowledge of the test enabled her to manipulate her results. Instead, Dr. Shifrin scored the Debtor based on his interviews with her.

to her job success.

Again, the Debtor bears the burden of proving, beyond a preponderance of the evidence, that her mental condition prevents her from working.[22]  In sum, I find that the Debtor failed to prove that she suffers from a mental disorder that prevents her from being capable of obtaining and maintaining gainful employment within her field.

The Debtor testified that the existence of the debt causes her anxiety and thus contributes to her depression.  Dr. Shifrin testified that the existence of the debt is one factor, along with others, such as her prior failed marriage, and her failure at the Forest Institute, which have contributed to her depression.   It is certainly understandable that incurring the amount of debt now due, without obtaining the degree she sought, would contribute to her anxiety.  However, the evidence does not establish that the existence of any debt at all is determinative in her ability to function and to work.  Indeed, Dr. Shifrin testified that her condition is improving, despite the existence of the student loans.

### 3.  The Debtor's Attempts to Obtain Employment

As to the Debtor's claim that no one will hire her, she offered, *inter alia*, an affidavit, which she claims is not exhaustive of her quest for employment, showing

---

[22] *In re Andrews,* 661 F.2d at 704.

12

that she applied for 26 different clinical, assistant or research positions throughout the country between April 2006 and January 2007.[23]    The Debtor testified that she received no response from the great majority of the organizations to which she has applied and that her follow-up inquiries, mainly done through email, revealed nothing as to why she was not employed.  In addition, the Debtor has applied for several other positions unrelated to the field of psychology, including jobs in the artistic field (due to her minor in art) and retail sales positions, none of which actually resulted in a job offer.

However, despite her failure to find employment, the Debtor admitted that she has not met with a job counselor, an employment agency, or career service center to assist in her search; instead, she has relied mainly upon intermittent searches on the internet.  In addition, the majority of the positions to which the Debtor submitted applications were, by the Debtor's own admission, unlikely to lead to employment because they were in distant locales.  I find that the Debtor's applications to various cities across the country, her subsequent lack of follow-up correspondence, and her decision not to seek professional job assistance, were unlikely to yield any realistic employment opportunities.  In sum, I find that the Debtor is able to find employment,

---

[23] The Debtor applied for positions in Arkansas, Arizona, Iowa, New Mexico, Hawaii, Florida, California, Missouri and New York.

13

and "[i]n this district, a debtor who has the ability to work, must work."[24]

Although the Debtor claims that she is unable to get a job in a psychology-related field because her reputation in the community has been damaged as a result of her experience at the Forest Institute, she offered no corroborating evidence on that claim. I find, therefore, that there is no reason to believe that she cannot find employment in a field related to her degree.

### 4. The Debtor's Earning Capacity

That being the case, Dr. Shifrin testified that a reasonably accurate annual salary range in the state of Missouri for a community or social service occupation in a psychology-related field without a doctorate degree is between $30,000 and $40,000.[25] According to the May 2007 State Occupational Employment and Wage Estimates statistics for the State of Missouri gathered by the United States Department of Labor and submitted by the Debtor as a trial exhibit, salaries for the six community and social service occupation categories for which the Debtor would be qualified range from $31,340 to $46,230, and average $37,385.[26] I will assume, therefore, that

---

[24]  *In re Clark*, 240 B.R. 758, 762 (Bankr. W.D. Mo. 1999).

[25] As stated above, the Debtor does not have her doctorate degree and she testified that it is unlikely that she would receive that degree because she would essentially have to start over with a new program and incur additional student loans in the process.

[26] The six occupation categories and corresponding mean annual salaries include: Community and Social Service Occupations ($36,650); Mental Health Counselors

the Debtor could earn an annual salary of $40,000 from a job in her field.

The Debtor's assumed annual income must then be reduced by tax liabilities on

that amount: $8,327 for federal income tax,[27] $2,175 for Missouri state income tax,[28]

and $2,480 for social security taxes,[29] for a total tax liability of $12,982. Therefore,

her assumed annual income after taxes is $27,018, or $2,251.50 per month.

### B. The Reasonable Necessary Living Expenses of the Debtor and the Debtor's Dependents

I previously found that the Debtor's schedules showing a total of $135 in

monthly expenses are reasonable.[30] However, these monthly expenses were based on

the Debtor's present circumstances of living with her parents. The Debtor testified

---

($46,230); Rehabilitation Counselors ($31,340); Counselors, All Other ($32,210); Child, Family and School Social Workers ($33,380); and Social Workers, All Other ($44,500).

[27] 26 U.S.C. § 1(c). The Debtor is assumed to be an unmarried individual (other than surviving spouses and heads of households) with a taxable income over $22,100 but not over $53,500. Her tax liability is, therefore, calculated by adding $3,315 plus 28% of the excess of her annual income ($40,000) over $22,100; this yields a liability of $8,327. *Id.*

[28] Mo. Rev. Stat. § 143.011. The Debtor is a resident of Missouri with a taxable income over $9,000. Her tax liability for state income tax purposes is calculated by adding $315 plus 6% of the excess of her annual income ($40,000) over $9,000; this yields a liability of $2,175. *Id.*

[29] 26 U.S.C. § 3101(a). The Debtor must pay a tax equal to 6.2% of her wages received by her with respect to her employment. *Id.* Therefore, her tax liability for social security purposes is $2,480.

[30] *See Order Denying Motions for Summary Judgment by Defendants Sallie Mae, Inc. and Educational Credit Management Corporation* (Doc. #114) (September 9, 2008).

that she desires to move out of her parents' house and that she would do so "in a minute" if she could afford to do so. For these purposes, I certainly would not expect the Debtor to live with her parents throughout a student loan repayment period in order to minimize expenses. As such, I find it to be more reasonable to use necessary living expense figures that reflect the eventuality that she will move out. The Debtor offered a list of estimated living expenses that she would incur if she did move out of her parents' house. Those expenses are set out below:

| | |
|---|---|
| Rent | $550.00 |
| Renter's insurance | 20.00 |
| Utilities | 110.00 |
| Health insurance | 150.00 |
| Prescription medication | 95.00 |
| Auto payment | 350.00 |
| Auto insurance | 85.00 |
| Food | 400.00 |
| Gas | 175.00 |
| Health & Beauty | 75.00 |
| Miscellaneous household items | 75.00 |
| Clothing/laundry | 100.00 |
| Entertainment | 15.00 |
| Phone | 50.00 |
| Licensure & Certification fees | 25.00 |
| Continuing Education course fees/travel | 54.00 |
| Church tithing/charitable donations | 33.00 |
| Professional liability insurance | 10.00 |
| Uninsured medical bills | 38.00 |
| Vacation/travel/rental car | 46.00 |
| Total Expenses | $2,456.00 |

16

I find these estimated expenses to be reasonable.

### C.  Other Relevant Facts and Circumstances
### Unique to the Particular Case

Bankruptcy Courts in the Eighth Circuit have looked to a number of factors to assist them in making the "totality of circumstances" determination.[31]  While those factors are helpful in some cases, they have not been expressly adopted by the Eighth Circuit as part of the totality of circumstances test, and many of the factors are often irrelevant when applied in a particular case.  Moreover, several of these factors overlap with the first two factors in the *Andrews* test and, thus, do not warrant further discussion.

However, courts in the Eighth Circuit have held that it is appropriate to consider restructuring options available to the Debtor to determine whether there is an undue

---

[31] These factors include: (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loans; and (9) the ratio of student loan debt to total indebtedness. *See, e.g., Houshmand v. Missouri Student Loan Program (In re Houshmand),* 320 B.R. 917, 920 (Bankr. W.D. Mo. 2004); *VerMaas v. Student Loans of North Dakota (In re VerMaas),* 302 B.R. 650, 656-57 (Bankr. D. Neb. 2003); *Morris v. Univ. of Arkansas (In re Morris),* 277 B.R. 910, 914 (Bankr. W.D. Ark. 2002).

hardship,[32] and I agree that that is a relevant factor. With respect to the $32,063.73 in loans held by Sallie Mae, the Debtor does not qualify for any income contingent repayment options; rather, Sallie Mae says that borrowers may attempt to negotiate an alternative payment plan based on the particular circumstances. With respect to the $184,785.39 in loans held by ECMC, the Debtor qualifies for the Income Contingent Repayment Plan (ICRP) available as part of the William D. Ford Program.[33]

### 1. The Sallie Mae Loans

As of the date of the hearing, the Debtor owed Sallie Mae approximately $32,063.73, with variable interest rates. According to the exhibit attached to Sallie Mae's Proof of Claim, her monthly payment amount is $358.66 as of the date of the exhibit, for a term of 120 months.

### 2. The ECMC Loans

As shown, the Debtor's loans to ECMC total $184,785.39. The William D. Ford Direct Loan Program, administered by the U.S. Department of Education, offers

---

[32] *See, e.g., DeBrower v. Pennsylvania Higher Educ. Asst. Agency (In re DeBrower)*, 387 B.R. 587, 591 (Bankr. N.D. Iowa 2008) (stating that availability of ICRP is one factor to be considered); *Collins v. Educational Credit Mgmt. Corp. (In re Collins)*, 376 B.R. 708, 716 (Bankr. D. Minn. 2007) (holding that the availability of the ICRP is one factored to be considered, but is not determinative, nor should it be given undue weight by the court); *Bray v. Education Credit Management Corp. (In re Bray)*, 332 B.R. 186, 198 (Bankr. W.D. Mo. 2005) (holding that the court must consider the availability of repayment restructuring options).

[33] 34 C.F.R. § 685.209.

several repayment plans for the ECMC loans, including the income contingent plan,

which is intended to ensure a minimal standard of living based on the borrower's

income and the poverty level.   After 25 years of payments under an ICRP, the

remaining unpaid amount on the loan is discharged.[34]  Dr. Shifrin testified that it is

possible that entry into a repayment program could help a person dealing with self-

esteem issues but that, in the case of the Debtor, he could not say whether such a

program would lead to improvement.

Calculations under the ICRP begin with the borrower's pre-tax adjusted gross

income ("AGI").   As discussed above, I find that, despite her assertions to the

contrary, the Debtor is able to find employment in a psychology-related field, and that

she is capable of earning an annual income of $40,000.

According to the ICRP guidelines, the annual amount payable by the borrower

is the lesser of:

> (i) The amount the borrower would repay annually over 12
> years using standard amortization multiplied by an income
> percentage factor that corresponds to the borrower's
> adjusted gross income (AGI) as shown in the income
> percentage factor table in a notice published annually by
> the Secretary in the Federal Register; or

---

[34] *See* 34 C.F. R. § 685.209(c)(4).  It is unclear whether the discharge under the
ICRP creates tax liability.  To the extent a student loan is discharged in a bankruptcy case,
there is no tax liability to the debtor.

19

(ii)  20 percent of discretionary income.[35]

Under the formula found in subparagraph (i), the first step is to determine the borrower's annual payments based on what the borrower would pay over 12 years using standard amortization.[36]  To do this, the borrower multiplies the loan balance by the constant multiplier for the applicable interest rate (found on the chart in the Federal Register).[37]  The Debtor's loans with ECMC total $184,785.39, with an interest rate of approximately 4.5%.[38]  The corresponding constant multiplier for that interest rate is 0.108001,[39] which results in the Debtor having to pay $19,957 annually over 12 years.  Next, the borrower is to multiply that annual result by the income percentage factor that corresponds to the borrower's income (also found in the Federal Register) and then divide the result by 100.[40]  In this case, based on income of

---

[35] 34 C.F.R. § 685.209(a)(2) (2006).

[36] 72 Fed. Reg. 26803-01, 2007 WL 1372759 at *26804 (Attachment – Examples of Calculations of Monthly Repayment Amounts, Example 1, Step 1) (May 11, 2007).

[37] *Id.*  The constant multiplier is a factor used to calculate amortized payments at a given interest rate over a fixed period of time. *Id.*

[38] The actual weighted average of the interest rates on ECMC's loans is 4.425%.  If the exact interest rate is not listed on the Constant Multiplier Chart, one is to use the next highest rate for estimation purposes.  *Id.* at Step 2.

[39] *See* Constant Multiplier Chart for 12 Year Amortization, *Id.* at *26805.

[40] *Id.* at *26804, Example 1, Step 2.

20

$40,000, the Debtor's income percentage factor would be 93.34.[41]  This result, when divided by 100, yields an annual repayment amount of $18,627.86, or $1,552.32 per month.

Under the second formula, payments are 20% of the borrower's discretionary income.  Discretionary income is defined as the borrower's AGI minus the amount of the HHS Poverty Guidelines for all States (except Alaska and Hawaii) and the District of Columbia as published by the United States Department of Health and Human Services on an annual basis.[42]  The Poverty Guideline for a single person in Missouri is $10,400.[43]  The Debtor's discretionary income is, therefore, assumed to be $29,600 ($40,000 AGI minus the $10,400 poverty line), and 20% of this amounts to $5,920 payable annually, or $493.33 per month.  Since this is less than the constant multiplier calculation from subparagraph (i), the amount payable by the Debtor under the ICRP would be $493.33 per month, based on her assumed income.

---

[41]  *See id*. at *26805 (Attachment – Examples of the Calculations of Monthly Repayment Amounts, Interpolation) (providing instructions for calculating the income percentage factor when the borrower's exact income does not appear on the income percentage factor table).

[42]  34 C.F.R. § 685.209(a)(3).

[43]  The HHS Poverty Guidelines may be found on the United States Department of Health & Human Services' website, found at http://aspe.hhs.gov/poverty/08poverty.shtml.

As stated, the Court must consider dischargeability on a loan-by-loan basis. However, in considering this Debtor's special circumstances, I cannot ignore the fact that, even if she were in the ICRP offered by ECMC, she would face about $850 in student loan repayments per month, including those due Sallie Mae, based on assumed after-tax income of $2,251.50 per month. While I find that the Debtor is capable of managing some student loan repayment, forcing her to make payments in that amount would pose an undue hardship on her.

ECMC argues that the availability of the ICRP program is, in effect, dispositive of the issue of undue hardship, pointing out that if the Debtor in fact never finds a job above the poverty level, her payment under the ICRP will be zero. That is true but, as shown, if she did work at a salary she can be reasonably expected to earn, she would be unable to pay the ICRP obligation, let alone the Sallie Mae debt and her reasonable living expenses. For that reason, most courts,[44] including this one,[45] have

----

[44] *See, e.g., Fahrer v. Sallie Mae Servicing Corp. (In re Fahrer)*, 308 B.R. 27, 35 (Bankr. W.D. Mo. 2004) (rejecting Sallie Mae's argument that the availability of the ICRP means that repayment of the loan, based as it is on her income, cannot by definition constitute an undue hardship, and holding that it is but one factor for the court to consider); *Furrow v. U.S. Dept. of Educ. (In re Furrow)*, 2004 WL 2238536, at *2 (Bankr. W.D. Mo. Sept. 28, 2004), (rejecting the Department of Education's argument that it was not an undue hardship for the Debtor to repay her student loan because the Department's ICRP ensured that repayment will never cause the student loan borrower to fall below a minimal standard of living as measured by the HHS Poverty Guidelines) (*citing Limkemann v. U.S. Dept. of Education*, 2004 WL 2032375, *4 (Bankr. N.D. Iowa 2004) ("A significant problem in the [Department's] argument is that requiring a bankrupt debtor to participate in the ICRP whenever eligible in lieu of receiving a discharge

22

held that the availability of the ICRP does not preempt judicial review in determining

the dischargeability of student loans.

## D. Conclusion

The *Andrews* test requires that the Court examine each prong and determine

from the total circumstances whether nondischarge of the student loans would create

an undue hardship on the Debtor.[46] Despite the fact that the Debtor may suffer from

some depression, she has the ability to work in a field in which she holds a Master's

degree. Nevertheless, based on the evidence, her earning potential in that field is

limited because of her failure to complete her doctoral degree. The problem she faces

is that if she earns what the evidence showed she can reasonably hope to earn, she

---

deprives the bankruptcy court of its role in determining undue hardship."); *In re Durrani,*
311 B.R. 496, 508-09 (Bankr. N.D. Ill. 2004) (substituting the ICRP for the "thoughtful
and considered exercise" of the court's discretion would convert an undue hardship
inquiry into a "rote and meaningless exercise"); *In re Korhonen,* 296 B.R. 492, 496
(Bankr. D. Minn. 2003) ("The [ICRP] cannot trump the Congressionally mandated
individualized determination of undue hardship."); *In re Johnson,* 299 B.R. 676, 682
(Bankr. M.D. Ga. 2003) ("If Congress had intended the question of dischargeability of
student loans to be delegated to a nonjudicial entity, no matter how fair its formulas and
intentions may appear, it could have provided for such."); *Newman v. ECMC,* 304 B.R.
188 (Bankr. E.D. Pa. 2002) (stating that the court was unaware of any decision holding
the availability of the ICRP by itself requires a finding it would not be an undue hardship
to repay student loan obligation)).

[45] *See Furrow*, 2004 WL at *3 ("For this Court to simply delegate to the
Department of Education the determination of what Plaintiff can afford to pay on her
student loan would be to abdicate the responsibility given it by Congress to make the
determination of undue hardship.").

[46] *See In re Schmidt*, 294 B.R. 741, 751 (Bankr. W.D. Mo. 2003).

23

would have after-tax pay of $2,120.20 per month. Yet, even if she were in the ICRP, and earning that amount, she would face combined loan payments of $851.99. Although I find that the Debtor is capable of making some student loan payments at that assumed level of salary, requiring her to pay $851.99 per month on them would impose an undue hardship on her, particularly since it would give her no reasonable incentive to work at all. The question then is which loans she should remain obligated to pay.

As stated, the ECMC loans provide a repayment option based on her ability to pay, but the Sallie Mae loans do not. Therefore, I find that the Sallie Mae loans impose the greater hardship. In addition, however, requiring the Debtor to repay all twenty-seven of the ECMC loans would impose an undue hardship as well. That is so because, if she were to earn at her potential, she would still face a monthly payment of $493.33 per month, on top of other reasonable expenses which exceed her income. The only way to reduce that payment to an amount that she could reasonably be expected to pay on the assumed level of income would be to discharge some, but not all, of the ECMC loans. Although I assume for these purposes that bankruptcy courts in this Circuit are not permitted to discharge a portion of a single student loan, there

is authority for the proposition that a Court can discharge some, but not all, of the loans due to a particular creditor.[47]

Based on the evidence, I conclude that it would impose an undue hardship on the Debtor to require her to make payments in excess of about $300 per month.  Under the ICRP, again assuming income of $40,000, her payments would exceed $300 unless the total indebtedness was reduced to about $35,000.  Discharging the student loans identified on ECMC's Loan Balance as of September 3, 2008, except for the loans identified as Loans 15 through 27, would result in the Debtor owing ECMC $36,658.54 as of that date.  Using the formula found in subparagraph (i) of the Code of Federal Regulations discussed above, the Debtor's payment under the ICRP would

---

[47] *In re Andresen*, 232 B.R. at 136-37.  Although some of the ECMC loans may have been consolidated prior to being assigned to ECMC, ECMC's Answer indicates that at least the sixteen loans it received from USA Funds (identified as Loan Nos. 12 to 27 on ECMC's Trial Exhibit 1), have not been consolidated.  *See Answer of Defendant ECMC* (Doc. #20) at ¶ 2; *see also Motion to Add ECMC as a Defendant* (Doc. #7) at ¶ 2-4.  In addition, ECMC's Trial Exhibit 2 shows a Loan History for the Debtor with various loan types, none of which are categorized as "Consolidation Loans."

be approximately $316.47[48] if she were to earn $40,000 per year and she owed

$36,658.54 to ECMC.

Even assuming that the Debtor could get a job at the highest paid position she

is qualified to hold, *i.e,* a mental health counselor, her salary would be approximately

$46,230 according to the State Occupational Employment and Wage Estimates

statistics she offered as evidence at trial.  If she were able to find a job earning that

salary, her payment under subparagraph (i) would be $339.05, and would remain at

that amount until such time as her salary exceeded $54,680,[49] which, based on the

evidence, is highly unlikely.

In a motion to reconsider this Court's original Memorandum Opinion, ECMC

points to my finding that, once the Debtor is employed, she could make student loan

payments of about $300 per month without imposing an undue hardship on her, and

argues that, by utilizing some of the other repayment options under the William D.

---

[48] The weighted average of the interest rates on the loans not being discharged is approximately 4.7%.  Since that exact interest rate is not listed on the Constant Multiplier Chart, we use the next highest rate for estimation purposes, which is 5.0%.  *See* 72 Fed. Reg. 26803-01, 2007 WL 1372759 at *26804, at Step 2.  $36,658.54 multiplied by the constant multiplier for the 5.0% interest rate (.110987) results in the Debtor having to pay $4,068.62 annually over twelve years.  Multiplied by the income percentage factor corresponding to the Debtor's assumed income of $40,000 (93.34) and dividing by 100, the result is an annual repayment amount of $3,797.65, or $316.47 per month.

[49]  The payment remains the same at this level of salary because the income percentage factor for salaries between $45,464 and $54,680 stays steady at 100.00.

26

Ford program,[50] the Debtor would be able to repay $61,927.29 of her student loans, without constituting an undue hardship, by immediately beginning to make payments of approximately $300 per month.  However, my finding that requiring the Debtor to repay about $300 per month would not pose an undue hardship is based on the assumption that, when she is required to pay that amount, she will have an approximate annual income of $40,000.

Under ECMC's suggested alternative repayment options, the Debtor is required to pay about $300 per month regardless of her income, of which presently she has none.  As I said above with regard to the Sallie Mae loans, it is the availability of the income contingent option that makes a portion of the ECMC loans nondischargeable because that option allows the Debtor the ability to find employment with an annual salary in line with what she is capable of earning.  Consequently, ECMC's motion to reconsider will be denied.

In sum, I find that requiring the Debtor to pay student loans in excess of $36,658.54, even under the ICRP, would impose an undue hardship on her.  The Sallie Mae loans, and the ECMC loans identified as Loans 1 through 14 will, therefore, be

---

[50]  ECMC refers to the Standard Repayment Plan, the Extended Repayment Plan and the Graduated Repayment Plan options available under the Ford Program.

discharged.    The ECMC loans identified as Loans 15 through 27 will not be

discharged.

/s/ Arthur B. Federman
Bankruptcy Judge

Date: 11/21/2008

Court to serve parties not receiving electronic notice